**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Daniel Barsanti, Bradley Vargas, and Darren Lawhorn,<br><br>               Plaintiffs,<br><br>v.<br><br>Cameron DeLoach, Nathan Butterfield, ProCapital Holdings LLC, ProLux Energy LLC, and Solarships Installation Services LLC,<br><br>               Defendants. | No. CV-25-00303-PHX-KML<br><br>**ORDER** |

Plaintiffs Daniel Barsanti, Darren Lawhorn, and Bradley Vargas formed a solar panel installation business with defendants Nathan Butterfield and Cameron DeLoach. After Lawhorn accused Butterfield and DeLoach of fraudulently securing solar panel financing, Butterfield and DeLoach purportedly removed Lawhorn as a member and manager. Plaintiffs seek a temporary restraining order that would, in effect, reinstate Lawhorn as a member-manager, prohibit Butterfield and DeLoach from unilaterally making operating decisions, and require all member-managers to unanimously agree to any proposed spending.

The present record does not establish plaintiffs are entitled to the extraordinary early relief they seek.

## I.    Background

Before October 2023, Barsanti, Lawhorn, and Vargas owned and operated

defendant Solarships Installation Services, LLC (SIS), a solar installation business that assists homeowners in financing solar installation and then installs and services the solar systems. (Doc. 6-2 at 2.) In October 2023, SIS merged with defendant Pro Lux Energy, LLC (PLE), a solar sales company owned and operated by Butterfield and DeLoach, to create defendant Pro Capital Holdings, LLC (PCH). (Doc. 6-2 at 2.) SIS and PLE each changed their organizational structure such that PCH became the sole member of both entities. (Doc. 6-3 at 3.) In connection with this merger, all members executed the Operating Agreement of PCH. (Doc. 1 at 30.)

PCH maintains a relationship with non-party Palmetto Solar, LLC, which finances solar installation for homeowners through secured loans repaid by a combination of homeowner payments and sale back of solar power to the local utility. (Doc. 6-3 at 2.) Palmetto provides preferential loan rates and terms to homeowners whose houses have ideal conditions for generating solar power, such as a south-facing roof and lack of overhanging trees. (Doc. 6-3 at 3.) Approximately 20 percent of homes will have these optimal conditions. (Doc. 6-3 at 3.) The remaining 80 percent could still qualify for loans with Palmetto but under less favorable conditions, including a longer term of repayment. (Doc. 6-3 at 3.)

As managers of PCH's sales teams, Butterfield and DeLoach instructed their salespersons on which loan terms were available to each house. (Doc. 6-3 at 3.) According to Lawhorn, Butterfield and DeLoach had encouraged their salespersons to falsely report each home's conditions in Palmetto's software so that every loan contract qualified for preferential terms, which provide the highest commission. (Doc. 6-3 at 3, 5.) This resulted in over 80 percent of installations sold at the highest rate of return. (Doc. 6-3 at 3.) Lawhorn and Vargas, who were responsible for installation, were then forced to negotiate with Palmetto to seek its approval to install additional solar panels on these homes so that the installations would produce the amount of solar energy needed to conform to Palmetto's requirements. (Doc. 6-3 at 4.)

Lawhorn told Butterfield and DeLoach about the incorrect sales and offered to train

- 2 -

the sales teams but Butterfield and DeLoach refused. (Doc. 6-3 at 5.) As a result of these issues, Palmetto informed Vargas and Lawhorn that it would no longer fund any deals that involved Butterfield and DeLoach and banned Butterfield, DeLoach, and PLE from accessing the software used to sell solar systems. (Doc. 6-3 at 5.) In response, Butterfield and DeLoach hired an attorney to send out a notice to Lawhorn from PCH, PLE, and SIS purporting to involuntarily remove him as a member from PCH. (Doc. 6-3 at 6.) Butterfield and DeLoach then informed PCH's business partners and employees that Lawhorn was no longer associated with PCH, PLE, and SIS. (Doc. 6-2 at 4.)

After this purported removal, Butterfield and DeLoach have hired family members for positions at PCH for which they are not qualified and used company funds for personal expenses. (Doc. 6-3 at 8–9.) On December 20, 2024, plaintiffs filed their complaint in the U.S. District Court for the Northern District of California alleging ten causes of action: breach of fiduciary duty, breach of contract, breach of the duty of good faith and fair dealing, breach of the California Consumer Legal Remedies Act (CCLRA), defamation, fraudulent concealment, fraud in the inducement, breach of the Fair Labor Standards Act (FLSA), breach of the Defend Trade Secrets Act (DTSA), and declaratory relief. (Doc. 1.)

Three weeks later, plaintiffs moved for an ex parte temporary restraining order and preliminary injunction against defendants, seeking an order enjoining defendants from blocking Lawhorn's "involvement and participation in the corporate actions" of PCH, SIS, and PLE; making unilateral decisions "as to the operation" of PCH, SIS, and PLE; and "spending or disbursing the moneys" of PCH, SIS, and PLE without unanimous agreement from all members. (Doc. 6-1 at 4.) After consenting to the jurisdiction of this court, the case was transferred to the District of Arizona. (Doc. 19.)

## II.    Analysis

### A. Standard for Early Injunctive Relief

A court must analyze a request for a temporary restraining order or preliminary injunction under two slightly-different tests. First, a court must evaluate if there is a likelihood of success on the merits, if there is a likelihood of irreparable harm, whether the

balance of equities tips in plaintiff's favor, and whether an injunction would be in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2009). A court must also assess whether "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor" in addition to showing "a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011).

## B. Likelihood of Success or Serious Questions

In their initial motion, plaintiffs argue they are likely to succeed on the merits of their claim for breach of fiduciary duty based on Butterfield and DeLoach's actions. (Doc. 6-1 at 18.) That motion does not address any of the other claims. (Doc. 6-1 at 18–19.) On reply, however, plaintiffs address for the first time their breach of contract and defamation claims.[1] (Doc. 27 at 4–12.) Based on the available evidence and defendants' failure to respond to certain arguments, plaintiffs have made the requisite showing for some of their breach of fiduciary duty theories, but not others.

Plaintiffs argue Butterfield and DeLoach breached their fiduciary duty by taking actions allegedly contrary to the PCH Operating Agreement. According to plaintiffs, Butterfield and DeLoach acted improperly by withdrawing and dissociating Lawhorn without first acquiring a judicial determination of wrongdoing or providing notice. (Doc. 1 at 10–12.) Plaintiffs misread the plain terms of the agreement.

The Operating Agreement does not define but appears to treat "withdrawal" and "dissociation" as separate but interconnected events. The agreement outlines some circumstances that may result in the voluntary or involuntary withdrawal of a member from PCH. (Doc. 1 at 35–36.) In the event of a withdrawal, a member appears to be dissociated and the remaining members may on written notice elect to purchase the interest of a

---

[1] Plaintiffs also referenced their FLSA claim in the title of one section, but provided no meaningful argument in support. (Doc. 27 at 5.) Any FLSA argument would therefore be forfeited even if not raised for the first time on reply. *See Ohio House, LLC v. City of Costa Mesa*, 122 F.4th 1097, 1129 (9th Cir. 2024) (declining to analyze issue held forfeited because party provided no meaningful argument or authority). Separately, plaintiffs argue defendants are defaming Lawhorn for the first time on reply. (Doc. 27 at 12.) Arguments raised for the first time in a reply brief are waived. *In re Bard IVC Filters Prod. Liab. Litig.*, 81 F.4th 897, 908 n.13 (9th Cir. 2023).

1    withdrawing member. (Doc. 1 at 36.) In effect, a member may be "withdrawn" but retain

2    ownership of his interest in the company. The Arizona Limited Liability Company Act

3    (ALLCA), which governs the terms of the Operating Agreement except where otherwise

4    provided (Doc. 1 at 30), notes that dissociation terminates the dissociated member's "right

5    to participate as a member in the management and conduct" of the company and the

6    dissociated member's duties and obligations as a member. *See* A.R.S. § 29-3603.

7        Defendants purported to involuntarily withdraw Lawhorn as a member under

8    paragraphs 57 and 60 of the PCH Operating Agreement. (Doc. 1 at 26.) Paragraph 57

9    forbids any member from "do[ing] any act that would make it impossible to carry on the

10   ordinary business of the Company." (Doc. 1 at 26.) Paragraph 60 explains that any

11   violation of this provision "will be deemed an Involuntary Withdrawal and may be treated

12   accordingly by the remaining members." (Doc. 1 at 26.) Plaintiffs argue involuntary

13   withdrawals are governed by paragraph 30 of the agreement, which they claim requires the

14   remaining members to secure a judicial determination of wrongdoing before expelling[2]

15   another member. (Doc. 6-1 at 11.) But the PCH Operating Agreement is clear that a judicial

16   determination of wrongdoing is one of many methods that *can* lead to involuntary

17   withdrawal, but it is not the only way. (Doc. 1 at 36.) Strangely, the PCH Operating

18   Agreement nowhere explicitly provides a procedural mechanism for involuntary

19   withdrawal. To the extent ALLCA offers such a method, plaintiffs do not point to one and

20   therefore have not met their burden of making a "clear showing" that they are likely to

21   succeed on the merits. *Apartment Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*,

22   10 F.4th 905, 911 (9th Cir. 2021).

23       Plaintiffs also argue defendants improperly dissociated Lawhorn by failing to

24   provide written notice and valuation of Lawhorn's interest in PCH before his dissociation.

25   (Doc. 6-1 at 18.) Yet again, plaintiffs misread the agreement. Written notice of dissociation

26   and valuation of a dissociated member's interest is only necessary "if the remaining

27   Members elect to purchase the interest of the withdrawing Member." (Doc. 1 at 36.)

28   _____

[2] "Expulsion" is yet another term that is undefined in the PCH Operating Agreement. (Doc. 1 at 36.)

Butterfield and DeLoach explicitly informed Lawhorn in the notice of withdrawal that "the remaining Members are deciding whether to elect to purchase" Lawhorn's interest and would provide written notification if they did. (Doc. 1 at 26.) And plaintiffs do not allege Butterfield and DeLoach later attempted to purchase Lawhorn's interest. The PCH Operating Agreement appears to authorize exactly what happened with Lawhorn: He was withdrawn but his interest in PCH was not purchased.

For the first time on reply, plaintiffs raise three new theories for breach of the PCH Operating Agreement and accordingly breach of fiduciary duty: 1) Lawhorn did not commit any forbidden acts that would support involuntary withdrawal; 2) Butterfield caused PCH to incur a debt over $1,000 without unanimous consent to pay his personal expenses to AxGuard; and 3) Butterfield and DeLoach funneled sales to Ascension, a competitor of SIS. (Doc. 27 at 12.) Arguments raised for the first time in a reply brief are waived. *In re Bard IVC Filters Prod. Liab. Litig*., 81 F.4th 897, 908 n.13 (9th Cir. 2023). Plaintiffs' argument that Butterfield improperly caused PCH to incur a debt over $1,000 to repay AxGuard for a PLE loan without the unanimous consent of the other members appears to be potentially meritorious under paragraph 65 of the PCH Operating Agreement and creates the possibility that the analysis would differ if properly raised.

Plaintiffs' other theories first raised on reply, however, are not meritorious. Although Lawhorn's communications with AxGuard and actions to repair PCH's relationship with Palmetto were likely not forbidden acts under the PCH Operating Agreement, plaintiffs do not explain why incorrectly identifying forbidden acts constitutes a breach of the PCH Operating Agreement or of the duty of loyalty. (Doc. 27 at 12.) As to Butterfield and DeLoach's agreement with Ascension, the PCH Operating Agreement explicitly modifies the members' duty of loyalty to one another, permitting members to contract with PCH competitors. (Doc. 1 at 35.)

Butterfield and DeLoach do not dispute plaintiffs' remaining properly-presented theories for breach of fiduciary duty based on the hiring of relatives for unnecessary positions, spending corporate funds for personal use (such as dinners and groceries), and

continuing to draw a salary. This non-opposition means the court assumes plaintiffs have a strong likelihood of success or, at least, there are serious questions going to the merits.

## C. Likelihood of Irreparable Harm

Plaintiffs claim Butterfield and DeLoach's actions harm the company by 1) "paying members of their family to do tasks which are unnecessary" or for which the relatives are unqualified; 2) diverting corporate funds for personal use; 3) impacting PCH's sales by straining the company's relationship with Palmetto, the solar funding source; and 4) entering into a relationship with another company that took work from SIS, cutting its potential profits. (Doc. 6-1 at 20.) Each of these alleged harms is economic, which "is not generally considered irreparable." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021). But economic harm that threatens "extinction . . . even when damages may be available and the amount of direct financial harm is ascertainable," rises to the level of irreparable harm. *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022).

Here, the only harm connected to plaintiffs' likely meritorious theories is Butterfield and DeLoach's payments to family members for unnecessary tasks and diversions of corporate funds for personal use (and possibly the AxGuard repayment if presented properly).[3] *Cf. Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.,* 810 F.3d 631, 635–36 (9th Cir. 2015) (affirming denial of motion for temporary restraining order where alleged irreparable harm was unconnected to substantive claims); *Garcia v. Google, Inc*., 786 F.3d 733, 744 (9th Cir. 2015) (reversing grant of motion for temporary restraining order where alleged threat of physical injury was unrelated to substantive copyright claim).

Plaintiffs have provided only minimal evidence that PCH might be driven out of business by Butterfield and Deloach such that the economic harm they fear should be deemed irreparable. The only potential existential harm is connected to PLE's failure to sell solar systems, allegedly due to involuntarily withdrawing Lawhorn—which, as discussed above, is not likely meritorious—not payments to Butterfield and DeLoach's

---

[3] Plaintiffs tie the lack of sales to strain in the Palmetto relationship based on Lawhorn's involuntary withdrawal. (Doc. 6-3 at 5, 8.) As described above, neither that withdrawal nor entering into a relationship with a different company were prohibited by the terms of the agreement.

family members or for personal use. (Doc. 6-2 at 3; Doc. 6-3 at 8.)

A finding of irreparable injury is appropriate "where the underlying injury does not readily lend itself to calculable money damages." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1003 (9th Cir. 2023). For example, irreparable injury may exist where damages can only be calculated after a "protracted and speculative inquiry." *Id.* Here, plaintiffs' have not explained why it would be inordinately difficult to calculate the economic damages they allegedly will suffer from improper personal expenses or employing Butterfield and DeLoach's relatives if injunctive relief is not issued. To the contrary, these expenses appear to be readily calculable.

Plaintiffs further speculate that those willing to hire their family members to "squeeze monies out of a business are unlikely to stop there" and ask the court to prohibit Butterfield and DeLoach from accessing PCH, PLE, and SIS's bank accounts. (Doc. 6-1 at 20.) They also add that Butterfield and DeLoach "could continue with wrongful 'dissociations' of members," having removed Barsanti from the list of corporate members with the Arizona Secretary of State, and could deprive those members of the ability to "participate in the business operations" of PCH. (Doc. 6-1 at 19–20.) But "[s]peculative injury cannot be the basis for a finding of irreparable harm." *In re Excel Innovations, Inc*., 502 F.3d 1086, 1098 (9th Cir. 2007). And plaintiffs do not connect Barsanti's removal from the Arizona Secretary of State corporate member list to the merits of their claims or explain how it harmed them.

Plaintiffs have not made a sufficient showing of irreparable harm.

### D. Balance of Equities

The balance of equities also weighs against granting relief to plaintiffs. The court must "weigh the damage to each [party] in determining the balance of the equities." *CTIA - The Wireless Ass'n v. City of Berkeley, California*, 928 F.3d 832, 852 (9th Cir. 2019) (quotation marks and citation omitted). The "damage to each" is measured as "the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.

Plaintiffs argue their requested relief would "fairly allocate decision-making power to the members of the LLCs" under the terms of their operating agreements. (Doc. 6-1 at 21.) They argue this power would stop Butterfield from drawing a salary when the other members have temporarily agreed to reduce their salaries to pay employees; stop Butterfield from using company credit cards for personal use; allow plaintiffs to "have involvement in the business operations"; and "lend itself to the members' ability to make financially prudent decisions" if the members were required to reach unanimous agreement before any "spending of the LLCs' money." (Doc. 6-1 at 21.)

As set forth above, it is not clear Lawhorn has any decision-making power under the terms of PCH's Operating Agreement after his involuntary withdrawal. Barsanti and Vargas appear to have retained their full powers and do not provide facts showing otherwise. Furthermore, nothing in PCH's Operating Agreement suggests Butterfield was required to stop drawing a salary when the other members abstained or that unanimous agreement was required before incurring liabilities or a single transaction expense under $1,000. And although plaintiffs argue certain payments for personal use and hiring Butterfield and DeLoach's relatives breach defendants' fiduciary duty to the other members, they only argue on reply that some of these payments also breach the PCH Operating Agreement because they exceed $1,000 and were approved without the members' unanimous consent. (Doc. 27 at 11.)

Defendants argue that Lawhorn's actions disrupted PCH, PLE, and SIS's operations and that his reinstatement would interfere with the management of PCH, PLE, and SIS's daily business affairs. (Doc. 25 at 15.) Withholding an injunction places plaintiffs at risk of suffering economic harm but granting an injunction could impose restrictions on defendants for the sake of power plaintiffs do not appear entitled to exercise. Thus, at present, plaintiffs' requested relief exceeds the scope of their rights under the PCH Operating Agreement and would possibly prevent only non-irreparable harm. Plaintiffs may, if they wish, renew their motion and request enforcement of the PCH Operating Agreement as to Barsanti and Vargas if they are able to show damages that cannot

otherwise be remedied at law. The balance of equities therefore favors defendants.

### E. Public Interest

The final factor the court must consider is the public interest. Both parties argue an injunction would affect third-party employees and PCH, PLE, and SIS's ability to pay their wages. (Doc. 6-1 at 21; Doc. 25 at 16.) Plaintiffs bear the initial burden of showing that an injunction is in the public interest, but the court does not need to consider potential consequences that are "highly speculative." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009).

Plaintiffs argue without an injunction, PCH, PLE, and SIS's financial resources "could [be] drain[ed]," "resulting in the insolvency of the business and unpaid employees." (Doc. 6-1 at 20.) They also argue some members reduced their salaries "to be able to pay the employees' wages." (Doc. 6-1 at 21.) Although PCH, PLE, and SIS have faced concerns with paying their employees, these issues appear to pre-date the actions plaintiffs now complain of. The court is therefore skeptical that the requested injunction will resolve plaintiffs' concerns. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv*., 886 F.3d 803, 819 (9th Cir. 2018) ("There must be a sufficient causal connection between the alleged irreparable harm and the activity to be enjoined," such as "showing that the requested injunction would forestall the irreparable harm.") (quotations omitted).

### F. Balance

A temporary restraining order is "an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Plaintiffs have shown a likelihood of success or serious questions going to the merits on some of their theories for breach of fiduciary duty, but they have not shown they will suffer irreparable harm or that the balance of equities and public policy tip strongly their favor. Based on the present record, a temporary restraining order is not merited. The analysis in this order turns on the limited arguments and limited record presented by the parties at this stage. Plaintiffs are free to renew their motion if they can present more convincing evidence supporting their claims. Defendants should keep in mind that plaintiffs have shown a likelihood of success or serious questions going to the

merits on some of their theories for breach of fiduciary duty. That creates a significant possibility that at some point, defendants might be subject to an injunction or monetary damages, and they should tailor their behavior and plans accordingly.

**IT IS ORDERED** the Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 6) is **DENIED**.

Dated this 20th day of February, 2025.

Honorable Krissa M. Lanham
United States District Judge